IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:_____

LINDA KOGAN,

      Plaintiff,

v.

UNIVERSITY OF COLORADO, through its Board, THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate,

      Defendants.

---

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

---

Plaintiff, Linda Kogan, by and through her counsel, hereby files this Complaint against Defendant, UNIVERSITY OF COLORADO, through its Board, the REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate, and in support thereof, states and alleges as follows:

## NATURE OF THE CASE AND THE PARTIES

1. This is a civil action for damages and other relief against Defendant University of Colorado under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 20003 *et seq.* (Title VII) for discrimination on the grounds of gender, orientation, retaliation and other deleterious terms and conditions of employment.

2. Plaintiff Linda Kogan ("Plaintiff") is a resident of the State of Colorado and performed work for Defendant at all times relevant to this Action.

3. Defendant University of Colorado ("Defendant") is a state institution of higher education established and regulated by Article IX, §§ 12 and 13, Colorado Constitution and State

1

statutory law, C.R.S. §§ 23-20-101, *et seq*. Defendant is an arm of the State of Colorado. It may sue and be sued through its governing body, the Regents of the University of Colorado.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices alleged to be unlawful were committed in the District of Colorado.

6. At all relevant times, Defendant was an "employer" within the meaning of Title VII.

7. Plaintiff has exhausted all administrative prerequisites to the filing of this action.

8. This lawsuit was commenced within ninety (90) days of Plaintiff's receipt of a Notice of Right to Sue, dated April 6, 2021, from the United States Department of Justice, Civil Rights Division with respect to Charge of Discrimination number 541202100712 filed with the United States Equal Employment Opportunity Commission.

## FACTUAL ALLEGATIONS

*Discrimination and Hostile Work Environment*

9. Plaintiff, a Jewish, lesbian woman, holds a master's degree from UCCS in sustainability studies, her area of specialization. She worked for Defendant since her matriculation from that program in 2004, a period of sixteen (16) years.

10. Based upon Plaintiff's own proposal, UCCS created a sustainability program and, after a competitive search, she was selected as the inaugural director in 2005.

11. Under Plaintiff's leadership, the UCCS sustainability program has earned national recognition as well as attracting students who prioritize environmental impact and environmental studies.

12. In 2017, an external review by Defendant's Environmental Director noted that UCCS had achieved STARS Gold status, virtually the highest recognition in the field, that the achievements of her office were distinguished and worthy of recognition, and that UCCS was "on the map as a sustainability leader nationally."

13. Plaintiff's role as Director involved communication and construction of relationships across the UCCS community to gain support for sustainability initiatives throughout the campus. Prior to her hire, UCCS had undertaken no such efforts but, by 2020, it had outpaced other programs nationwide which had been in existence for longer time periods.

14. In 2009, Plaintiff was appointed to the newly created position of Sustainability Director. She turned down a promising position at the University of Colorado Denver campus in order to accept the position.

15. Although UCCS publicly supported sustainability efforts, it did not adequately fund them.

16. In order to achieve the goals of the sustainability program, it was important for Plaintiff to have access to UCCS leadership.

17. During her tenure, and because of her passion for sustainability, Plaintiff routinely exceeded the scope of her job description and duties, performing tasks that should have been completed by an energy engineer.

18. From her initial appointment as Sustainability Director and through 2015, great strides for sustainability were accomplished due to Plaintiff's initiatives and efforts, which were empirically demonstrated in national rankings, improvement in performances metrics and program development.

19. There was a direct correlation between advances in sustainability at UCCS and Plaintiff's access to institutional leadership as well as the public support of the Vice Chancellor for Administration and Finance (VCAF) and the Chancellor.

20. Plaintiff was responsible to the VCAF in the performance of her job responsibilities and he supervised her work.

21. Plaintiff served as a member of influential leadership teams, participating in the Administrative Council, the leadership body of the VCAF, the Administrative Council Plus, as well as many ad hoc and policy committees.

22. In her role, Plaintiff met and collaborated with the prior Chancellor on numerous occasions, which resulted in public support for initiatives in Colorado Springs and participation in national commitments.

23. Commencing in 2015, Plaintiff was directed to report to the Associate Vice Chancellor for Facilities Management and Campus Planning, a newly created title for the existing Director of Facilities, who held lower status in the hierarchy of UCCS and who, considering sustainability a rival for his physical plant funding, did not prioritize the social justice and equity elements of the sustainability directorship. As a consequence, Plaintiff had significantly less contact with the VCAF but, nevertheless, was able to obtain feedback on critical programs and to remain effective in her position.

24. In May of 2017, with the onset of a new administration led by Dr. Venkateshwar "Venkat" Reddy, such feedback disappeared contemporaneously with the onset of a hostile and threatening work environment.

25. Under Dr. Reddy's leadership, the VCAF, a woman, was replaced by a male and a new Associate Vice Chancellor for Campus and Facilities Management, Mr. Kent Marsh, to whom Plaintiff was required to report, was hired.

26. Dr. Reddy's administration marked the beginning of organizational and administrative changes, further reducing Plaintiff's access to leadership. Additionally, longstanding female colleagues were terminated or forced to leave their positions under discriminatory circumstances or as the consequence of hostile work environments.

27. Despite Plaintiff's efforts to seek communications, clarity and collaboration, Dr. Reddy declined to meet with her one-on-one in 2018.

28. Notably, throughout Plaintiff's employment and until 2018, her performance reviews were excellent.

29. Throughout 2018 and 2019, Plaintiff discussed the need to meet with the cabinet, brief campus leadership, and obtain support for strategic planning with Mr. Marsh to no avail.

30. While stating on numerous occasions that sustainability was not a priority for the administration, Mr. Marsh demeaned Plaintiff as a person and a woman, marginalized her, threatened her, and put her in fear for her professional future at UCCS.

31. For example, Mr. Marsh would focus on his computer during meetings and regularly referred to himself as a "redneck". He routinely used the grossly offensive expression, "get her done," which had blatant and profound sexual connotations. Mr. Marsh informed Plaintiff that sustainability events were good but "since there was no meat, I can never get enough to eat", yet another sexually charged remark.

32. Plaintiff, as a Jewish, lesbian woman, found these comments to be sickening and disgusting, believing that they reflected bias against women in general and prejudice against her personally.

33. To compensate for Mr. Marsh's discriminatory and sexist remarks, Plaintiff provided him with more detailed information to share with UCCS leadership. She would occasionally send notices of external sustainability awards or recognition directly to Dr. Reddy and the VCAF but feared that even this would be perceived as disobeying the hierarchical structure.

34. In 2019, Plaintiff and several members of the Campus Sustainability Program met with the VCAF to discuss challenges and to obtain direction for the ten-year strategic planning initiative, explaining that they were witnessing a retreat, rather than advancement, of sustainability efforts. The VCAF disagreed with that assessment, stating that "Linda, sustainability is not complex", while denigrating her efforts and expertise in a belittling, condescending and sexist tone.

35. Despite the value of Plaintiff's efforts, her role on campus and the direct value-added benefit of sustainability to the broader community, she was increasingly and intentionally treated in a dismissive manner by Mr. Marsh.

36. Plaintiff remained isolated from direct contact with or access to senior leadership because the vice chancellors marginalized her on the basis of gender. Notably, all her superiors in the chain of command were male and they were repeatedly dismissive of other women at Defendant and their accomplishments. A climate of sexism and failure to engage with women on an equivalent basis to that applicable to men was in place.

37. Plaintiff sought "executive status" on a par to similarly situated males, but her requests were ignored. Plaintiff had to overcompensate for the incompetence of male

collaborators, assuming the lion's share of responsibility for initiatives. For example, she drafted a script and slides for the associate vice chancellor's presentation to the 2019 Sustainability Summit and, when he failed to appropriately prepare such that his address to the conference was below an acceptable standard, he laid blame on her for his own limitations, resulting in a basis for his subsequent retaliation against her.

38. On an ongoing basis, Mr. Marsh ignored Plaintiff's weekly updates, questioned her performance and belittled her. Despite her attempt to establish goals and seek feedback, Mr. Marsh continuously marginalized her on the basis of gender and "moved the bar" so as to create unreasonable expectations and lay a foundation for her further marginalization or removal.

*Retaliation*

39. Plaintiff documented the deficiencies of a subordinate, Kevin Gilford, the assistant director of her office, in 2017. Thereafter, Gilford took issue with her as a female leader and his direct superior. After resigning from his position, he brought false allegations against her; for example, he claimed that she had taken extended, unauthorized vacations when she was actually on a preauthorized leave of absence pursuant to the Family and Medical Leave Act ("FMLA"). Gilford threatened a vice chancellor, stating that he would commence litigation against UCCS, while simultaneously campaigning for her job. Notably, Gilford, who had been an instructor in the geography department, was not invited back to lecture because of poor performance ratings and student evaluations having no connection whatsoever to Plaintiff. Gilford misrepresented to Defendant that Plaintiff was not working because she was not physically present in her office even though her position, which was "forward-facing", involved meetings with constituencies in and out of UCCS, networking, and attending events.

40. In 2019, Mr. Marsh gave Plaintiff a "3", or satisfactory, performance review, in contrast to her customary "4" and "5" ratings, even though, during the 2018 year under review, she had created new programming, operated the sustainability office without an assistant director after Gilford's departure, and increased UCCS's sustainability score. In so doing, Mr. Marsh referenced the Gilford complaint while disingenuously later stating that it bore no relation to the assessment.

41. Mr. Marsh intentionally underrated Plaintiff's performance for discriminatory and retaliatory reasons on utterly pretextual grounds, exacerbating the hostile work environment.

42. Plaintiff sought the counsel of a representative of the human resources department who told her that, although she could file a formal complaint, it was unlikely to alter the situation and that she could not guarantee anonymity, further placing her job in jeopardy.

43. Thereafter, Plaintiff met with a professional executive coach in order to develop strategies with which to deal with the hostile work environment engendered by Mr. Marsh.

44. Gilford renewed and escalated his allegations against Plaintiff, writing to a member of Defendant's Board of Regents, stating that Defendant had failed to adequately, if at all, investigate what were patently false claims. Plaintiff filed an open records request, obtaining a copy of this letter.

45. Following Plaintiff's open records request, Defendant's leadership, including Dr. Reddy and Mr. Marsh, escalated their treatment of her; any legitimate, independent investigation would have disclosed the pattern of gender discrimination and hostile work environment.

46. At about this time, Plaintiff hired Brandon Bishop for a position in the sustainability office involving applied learning and engagement functions. Bishop had been Gilford's former student. Bishop did not perform well in the position and, when Plaintiff discussed the need for

him to improve, he quit, stating that she was a "washed up old professor that didn't know when to quit" and that "the leadership of the university did not respect [her]".

*The Audit Allegations*

47. On September 20, 2019, Plaintiff received an e-mail from Dr. Reddy postponing a scheduled meeting on the basis that she was under audit, the first instance on which she learned of the existence of such an audit.

48. Plaintiff contacted the UCCS ombudsman, Kathy Griffith, who provided no information to her with respect to the process but referred her to Deb Chapman, the internal auditor.

49. Ms. Chapman told Plaintiff that she had no rights whatsoever regarding the investigation and that Defendant had no obligation to even inform her that she was under audit or as to the nature of any allegations made against her.

50. Plaintiff inquired of Mr. Marsh who referred to a field trip to a farm and a solar installation project.

51. Two (2) months later, Plaintiff was advised that an initial interview with the auditor had been scheduled. When she asked Mr. Marsh on November 12, 2019 whether it would be advisable for her to obtain legal counsel, he told her that this "would give the wrong impression."

52. During the interview with the auditor, Plaintiff was provided with no allegations of which to frame a response. The auditor requested documents including a planning document for a day at the farm and inquired with respect to a solar project at the sustainability demonstration house; Plaintiff provided the auditor with all requested documents.

53. On December 17, 2019, more than two (2) years after his resignation, Gilford redoubled his efforts, sending an e-mail to Dr. Reddy in which he threatened to seek media coverage and to contact the district attorney unless his time theft allegations against Plaintiff were

investigated to his satisfaction. Referencing the Bishop complaint, he sought information about Plaintiff's pay history and vacation time from Defendant. He accused Dr. Reddy of complicity in the matter. He reached out to the press, resulting in an inquiry from the print media.

54. Plaintiff repeatedly reached out to Dr. Reddy and Mr. Marsh to express her concern and dismay at Gilford's defamatory allegations. Dr. Reddy and Mr. Marsh, being displeased with the negative attention Gilford had brought to bear on Defendant and themselves, increased their focus on Plaintiff by enabling his absurd claims, rather than dismissing them, thereby fomenting a hostile work environment against Plaintiff.

55. In late February 2020, more than five (5) months after Plaintiff had learned of the audit, she met with the auditor to review her report, learning, for the first time, of four specific complaints. The allegations consisted of time fraud, hiring a friend to install a solar project, providing a discount for a friend to take a solar class, and the field trip to the sustainable farm.

56. The auditor's report stated that the first three claims were unsubstantiated and unsupported. The auditor informed Plaintiff that the final item, which was deemed supported, was "mostly likely a policy of which you were unaware and, honestly, if you had been at Colorado College, would not have been an issue at all." Indeed, she stated that the solar project manager had given Plaintiff stellar reviews.

57. The auditor's report concluded that a professional development day activity, during which students were given the opportunity to pick sustainably grown garlic at a privately-owned farm, violated a university policy prohibiting a transfer of state funds to a for-profit entity. No funds had changed hands. The notion that the students' optional, hands-on activity, in which some of them had picked garlic for a brief period of time, had created excess profit for the farm because it did not pay laborers for such effort, seemed absurd to Plaintiff, at the very least.

58. Plaintiff had never been made aware of any such policy during her fourteen-year tenure at Defendant, if such a policy even existed.

59. In response to the purported violation, on March 2, 2020, Plaintiff composed a letter offering to pay for the less than $500 of value purportedly created for the farm; no response to that good-faith offer was forthcoming from Defendant.

60. Contemporaneously, Plaintiff learned that Gilford had redoubled his efforts to discredit Plaintiff because he had personally forwarded copies of such correspondence to Plaintiff for the purpose of intimidating her and, perhaps, to induce her to quit her job.

61. Dr. Reddy and Mr. Marsh abetted and participated in his continuing actions as cover for their campaign of harassment, hostile work environment and discrimination against Plaintiff, particularly because three of the four allegations had been dismissed and the fourth was preposterous and propounded because they sought to provoke her discharge on purely pretextual grounds.

62. On March 13, 2020, Plaintiff met with Mr. Marsh and the director of human resources for what she anticipated to be a routine performance review meeting; Plaintiff's performance review had been postponed until that date pending conclusion of the audit.

63. At that meeting, Plaintiff was handed a termination letter and asked for her keys and procurement card.

64. Plaintiff inquired as to the basis for her discharge and the human resources director responded that she was an at-will employee who had "done a very bad thing", speaking to her in a tone more appropriate to a recalcitrant child than to a program director.

65. The discharge letter was signed by Dr. Reddy, Mr. Marsh and Vice Chancellor Litchfield.

66. Plaintiff requested but, to date, has not been provided with a copy of the audit report.

67. At most, the violation of a purported university policy of which Plaintiff, as well as Defendant officials were unaware, should have resulted in a warning.

68. Dr. Reddy acted based on gender discrimination and for the purpose of retaliation.

69. Mr. Marsh acted based on gender discrimination and for the purpose of retaliation.

70. After more than two (2) years of escalating attacks on Plaintiff's character and judgment, which were engendered, encouraged and conducted, resulting in an ongoing hostile work environment, adverse job action was taken by Defendant because Plaintiff was female.

71. Defendant permitted unsubstantiated allegations made by former subordinates to give rise to stereotyping about her actions and abilities in violation of Title VII of the Civil Rights Act.

72. Dr. Reddy was incapable of accepting a woman, let alone a lesbian woman, as a leader.

73. Mr. Marsh was incapable of accepting a woman, let alone a lesbian woman, as a leader.

74. Dr. Reddy permitted and fostered Gilford to continue a campaign for Plaintiff's job, complete with threats of adverse publicity, rather than summarily dismissing them as obvious expressions of self-interest.

75. Mr. Marsh permitted and fostered Gilford to continue a campaign for Plaintiff's job, complete with threats of adverse publicity, rather than summarily dismissing them as obvious expressions of self-interest.

76. On January 5, 2021, Plaintiff filed Charge of Discrimination Number: 541202100712 with the EEOC, in which she alleged that Defendant had discriminated against her based on her gender and sexual orientation and had retaliated against her in violation of Title VII.

77. On April 6, 2021, the United States Department of Justice issued Plaintiff a Notice of Right to Sue with respect to the Charge of Discrimination.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, as amended)

78. Plaintiff, as a lesbian woman, is a member of the class of persons protected from discrimination on the bases of gender and sexual preference under Title VII.

79. Defendant, by and through its agents, and Dr. Reddy and Mr. Marsh, as individuals, intentionally engaged in unlawful employment practices against Plaintiff because she is a lesbian woman.

80. Defendant, by and through its agents, and Dr. Reddy and Mr. Marsh, as individuals, discriminated against Plaintiff in connection with the terms, conditions and privileges of employment in violation of 42 U.S.C. § 2000e(2)(a). The effect of these practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status because of her gender and sexual preference.

81. Defendant's unlawful employment practices, by and through its agents, and by Dr. Reddy and Mr. Marsh, as individuals, had a disparate and adverse impact on Plaintiff because of her gender and sexual preference.

82. Plaintiff was subjected to a hostile work environment based upon membership in protected classes and suffered disparate treatment as a consequence thereof.

83. Defendant retaliated against Plaintiff because of her membership in protected classes, resulting in her separation from employment on pretextual grounds.

84. Defendant are responsible and liable for the acts and omissions of its agents and employees. Defendant, by and through its agents, and Dr. Reddy and Mr. Marsh, as individuals, have discriminated and retaliated against Plaintiff on the bases of gender and sexual preference.

85. As a consequence of Defendant's conduct, Plaintiff has suffered damages and losses.

86. Defendant's conduct was engaged in with malice or with reckless indifference to Plaintiff's federally protected rights within the meaning of Title VII.

**SECOND CLAIM FOR RELIEF**
(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended)

87. Plaintiff opposed practices targeted at herself that were unlawful under Title VII, including discrimination based on gender and sexual preference.

88. As a result of Plaintiff's protected opposition to discrimination and the hostile work environment engendered and perpetuated by Defendant, Defendant retaliated against her by subjecting her to different terms and conditions of employment as described in this Complaint, including, but not limited to, treating Plaintiff in a condescending matter, questioning her achievements, pursuing an investigation against Plaintiff without due case, crediting accusations made against Plaintiff that lacked basis, accusing Plaintiff of unprofessional conduct, failing to thoroughly and properly investigate or otherwise address Plaintiff's complaints about discrimination, and making disparaging comments about Plaintiff to others.

89. Defendant's conduct violated 42 U.S.C. § 2000e-3(a) of Title VII.

90. As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation, and other pecuniary losses,

14

and emotional pain and suffering, mental anguish, inconvenience, loss of the enjoyment of life, and other non-pecuniary losses.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Linda Kogan, respectfully requests that this Court enter judgment in her favor and against Defendant, and order the following relief against them, respectively, to the extent provided by law:

- A. Compensatory damages including, but not limited to, those for emotional distress, inconvenience, mental anguish and loss of enjoyment of life;
- B. Back pay and benefits;
- C. Injunctive and declaratory relief;
- D. Front pay and benefits;
- E. Attorneys' fees and costs of this action, including expert witness fees, as appropriate;
- F. Pre-judgment and post-judgment interest at the highest lawful rate; and
- G. Such further relief as justice requires or the law allows.

**FURTHERMORE,** Plaintiff specifically prays that Defendant be enjoined for failing or refusing to:

- (1) Provide sufficient remedial relief to make Plaintiff whole for the losses she has suffered as a consequence of the discrimination and retaliation against her as alleged in this Complaint, including restoring Plaintiff to her position as Director of Sustainability at UCCS; and

(2) Take such other appropriate non-discriminatory measures to overcome the effects of the discrimination and retaliation.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted: May 6, 2021.

By: KATZ AND KERN, LLP

*s/ Chet Kern*
Chet Kern, Esq.
44 Cook Street
Denver, Colorado 80206
Tel. (303) 398-7000
Email: ckern@katzandkernllp.com
*Attorneys for Plaintiff Linda Kogan*

## CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the Bar of this Court.

*s/ Chet Kern*
_____
Chet Kern, Esq.
KATZ AND KERN, LLP
44 Cook Street
Denver, Colorado 80206
Tel. (303) 398-7000
Email: ckern@katzandkernllp.com
*Attorneys for Plaintiff Linda Kogan*

CERTIFICATE OF SERVICE

I certify that on May 6, 2021, I filed the foregoing with the Clerk of the Court using the CM/ECF System.

*s/ Chet Kern*
Chet Kern, Esq.
KATZ AND KERN, LLP
44 Cook Street
Denver, Colorado 80206
Tel. (303) 398-7000
Email: ckern@katzandkernllp.com
*Attorneys for Plaintiff Linda Kogan*